IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HAMED ALI,** | : | |
| | : | |
| Plaintiff, | : | No. |
| | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| **PENSKE TRUCK LEASING CO., L.P.** | : | |
| | : | |
| Defendant. | : | |
| | : | |

**COMPLAINT**

I. **INTRODUCTION**

Plaintiff Hamed Ali, through undersigned counsel, files this lawsuit against Defendant Penske Truck Leasing Co., L.P. for discrimination and retaliation in violation of federal and state laws. Plaintiff respectfully states the following:

II. **JURISDICTION AND VENUE**

1. The cause of action that forms the basis of this matter arises under Title VII of the Civil Rights Act of 1964, as amended 1991, 42 U.S.C. §2000e, et. seq. ("Title VII"), and the Pennsylvania Human Relations Act 43 P.S. § 951, as amended 1991("PHRA").

2. The District Court has jurisdiction over Count I and Count II (Title VII Claims) pursuant to 42 U.S.C. §2000e-5, 28 U.S.C. §1331, and 28 U.S.C. § 1343.

3. This Court has jurisdiction over Count III and Count IV (PHRA Claims) pursuant to 28 U.S.C. §1367, supplemental jurisdiction.

4. All actions complained of herein took place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania, as the place in which the claims arose and a place where Defendant conducts business.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in this District and the events giving rise to this action occurred in this District.

### III. PROCEDURAL REQUIREMENTS

6. On October 31, 2024, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission, Charge No. 530-2025-00855.

7. On December 18, 2025, more than a year after the Plaintiff filed his Charge of Discrimination, the EEOC issued a Notice of Right to Sue.

8. Plaintiff has satisfied all administrative prerequisites to bring this action.

### IV. PARTIES

9. Plaintiff Hamed Ali is a 57-year-old male resident of Bristol Township, Bucks County, Pennsylvania.

10. Defendant Penske Truck Leasing Co., L.P.is a Pennsylvania corporation with its principal place of business at 2675 Morgantown Road, Reading, PA 19607.

11. At all relevant times, Plaintiff worked at the Defendant's facility located at 4000 G Street, Philadelphia, PA.

12. At all relevant times, Penske Truck Leasing Co., L.P. was an "employer" within the meaning of Title VII and the PHRA.

## V. FACTUAL ALLEGATIONS

### A. Background

13. Plaintiff was hired by Defendant on or about August 16, 2022, as a Mechanic Tech 1.

14. Plaintiff's primary job duties included maintaining and repairing diesel engines in trucks.

15. Plaintiff worked at the Defendant's facility located at 4000 G Street, Philadelphia, PA, initially on the second shift from 3:00 p.m. to 11:00 p.m., and later on the morning shift.

### B. Hostile Work Environment

16. From the beginning of Plaintiff's employment, he was subjected to persistent harassment, mistreatment, and a hostile work environment based on his Arabic descent, Egyptian national origin, and Muslim religion.

17. During safety call instructions and procedures, which were 15-20 minute conference calls with 25-30 people from all shops, Plaintiff's coworkers would laugh at his accent and the way he pronounced certain words, making it difficult for him to participate and subjecting him to ridicule based on his national origin.

18. Plaintiff was frequently excluded from safety call instructions and procedures due to his accent and limited English proficiency.

19. On one occasion, when Plaintiff put on a company-provided beanie, his coworker, named Frank, looked at him, started laughing, and told everyone he looked like a "monkey."

20. After this racist incident, Plaintiff felt humiliated and would not wear the hat. Frank continued to walk around the shop, telling people to tell Plaintiff to put the hat on.

21. Marco, a Tech 2 and union representative, referred to Plaintiff as "the slave of Penske" and told him he was assigned so many jobs because of this.

22. Marco constantly watched and filmed Plaintiff without his consent, even though as a union representative, he was supposed to protect Plaintiff's interests.

23. When the Plaintiff asked Marco why he was filming him, Marco replied, "you are the slave of Penske," which devastated the Plaintiff and damaged his mental health for weeks.

24. When Plaintiff reported Marco's conduct to his supervisor Joel, Joel simply smiled in his face and took no action.

25. On November 4, 2022, at approximately 4:50 p.m., Plaintiff's coworker Frank deliberately sabotaged Plaintiff's work by turning on a truck Plaintiff was servicing, causing oil to spill under high pressure all over the engine and floor.

26. When Plaintiff reported this incident to management, no action was taken.

27. On June 10, 2023, Frank asked Plaintiff to help him with a truck and deliberately opened a fuel line, drenching Plaintiff's entire body and face in diesel. Frank laughed and said "he took a diesel shower."

28. After a month, Frank repeated a similar incident, drenching Plaintiff with coolant and laughing while saying, "I gave him a coolant shower."

29. When Plaintiff reported these incidents to his supervisor, no action was taken.

30. On another occasion, Frank positioned Plaintiff under a truck's air governor and released high air pressure exceeding 120 PSI directly at him, which could have resulted in

serious injury or death. The force was so strong that it knocked Plaintiff's glasses off his face and caused him to lose his balance.

31. Within six months of starting employment, the Plaintiff reported these dangerous incidents to management. The company allegedly investigated the incidents but took no action and imposed no discipline on Frank for his harassment of the Plaintiff.

32. On June 20, 2023, Plaintiff filed a formal written complaint with his supervisors regarding the harassment.

33. Two days after Plaintiff's June 20, 2023, written complaint, on or about June 22, 2023, supervisors John Ferrare, Augie, and Joel met with Frank and Plaintiff to discuss the complaint.

34. The June 22, 2023, meeting resulted in nothing more than a conversation between the parties. Defendant took no corrective action and imposed no discipline on Frank.

35. Plaintiff's coworkers, Frank and Osman Kamara, formed a pact against him, constantly watching and reporting on him to management.

36. Frank and Osman Kamara would often avoid work themselves while Plaintiff was assigned multiple tasks.

37. On November 17, 2023, Plaintiff was made to work on three trucks while Frank and Osman Kamara sat in the break room watching a game.

38. Plaintiff's manager would text him, stating, "I better see you working," even though Plaintiff was the only person working and rarely took lunch breaks.

39. Approximately ninety percent of the time during his two years of employment, Plaintiff never took lunch breaks due to his excessive workload, and his supervisors would call to tell him to remain active.

40. For approximately sixteen months on the second shift, from August 2022 through approximately December 2023, Plaintiff complained every day about the harassment he was experiencing.

41. When Plaintiff switched to the morning shift in December 2023, to escape harassment on the second shift, he lost $2 per hour in wages.

42. However, the harassment continued during the morning shift.

43. After Plaintiff switched to the morning shift, Marco, a Tech 2 and union representative, told Plaintiff in confidence that the bosses had instructed Marco not to help Plaintiff at all, stating: "they told me not to help you, they want to see you fail."

44. When Plaintiff confronted his supervisor, Joel, about Marco's statement, Joel simply chuckled without explanation.

45. When Plaintiff asked his supervisor, John Ferrare, for tools, specifically a grease gun, Ferrare responded, "I can't buy anything," demonstrating disparate and unfavorable treatment.

46. Defendant failed to provide Plaintiff with adequate training, providing only three weeks of visual training before assigning him to work independently on diesel engines.

47. In contrast, the Defendant provided the white employees with training and tools.

48. Defendant's management was aware that another employee of Arabic descent, Aladdin Elssayad, was also being subjected to harassment at the shop.

49. Aladdin Elssayad eventually walked out of the shop and called Defendant's Human Resources department to report racism at the shop.

50. Despite being aware of complaints from multiple Arabic employees about harassment and racism, Defendant failed to take any meaningful corrective action to address the discriminatory, hostile work environment.

**C.    Complaints of Discrimination**

51. Plaintiff complained to management about the harassment and discriminatory treatment on multiple occasions throughout his employment.

52. Despite Plaintiff's repeated complaints, Defendant failed to take any meaningful corrective action to stop the harassment or discipline the perpetrators

53. Instead of addressing the discrimination, Defendant's management participated in and facilitated the hostile work environment by instructing employees not to help Plaintiff and by failing to provide him with necessary tools and support.

**D.    July 11, 2024, Incident**

54. On July 11, 2024, at approximately 5:00 a.m., Plaintiff was involved in a car accident on Highway 95 between exits 27 and 26 when a truck tire struck his vehicle.

55. Despite the accident, Plaintiff arrived at work on time and completed all his assigned tasks, including transporting a truck from the Luzerne shop to the Oregon shop at noon.

56. At approximately 12:06 p.m., Plaintiff's supervisor Joel texted him to "clean up the coolant leaking under your car."

57. Plaintiff completed all his assigned work tasks by 2:30 p.m., at which time he clocked out for his lunch break.

58. During his lunch break, Plaintiff assessed the damage to his vehicle, and determined that he could not drive his car home without repairing it.

59. Plaintiff went to AutoZone and purchased a new radiator, radiator fan, and two gallons of coolant for his personal vehicle.

60. Plaintiff then returned to the shop and began repairing his vehicle during his off-duty lunch break, using his own tools from his personal toolbox and the parts he had purchased.

61. The only company equipment Plaintiff used to repair his car was one small jack and two small jack stands, and before he used the equipment, he confirmed that the second shift did not need these tools.

62. Two of Plaintiff's coworkers from the second shift, Frank and Osman Kamara, assisted Plaintiff in repairing his vehicle.

63. Marco, the union representative, was in the corner filming Plaintiff the entire time rather than informing him of any policy concerns.

64. Upon information and belief, a text message was sent to the Branch Manager, Joel Horvath, at 2:44 p.m. showing the Plaintiff's car hood up.

65. Plaintiff completed the repairs to his vehicle at approximately 6:30 p.m. and left the shop.

66. Approximately one week later, on July 18, 2024, union representative John Moses called Plaintiff to inquire about the events of July 11, 2024.

67. Plaintiff sent John Moses a detailed message explaining the accident and what occurred. John Moses replied: "I understand and it can be a bit nerving, but you did nothing wrong. You just did what you had to do to get home. Bottom line."

68. Plaintiff believed the matter was resolved based on the union representative's assurance.

### E. Pretextual Termination

69. On August 16, 2024, exactly two years after Plaintiff's hire date, general manager John Ferrare came to Plaintiff after his shift ended, along with two union representatives named Augie and Rob Green, who confiscated Plaintiff's access cards and informed him that he was terminated.

70. Defendant never interviewed the Plaintiff about the events on July 11, 2024.

71. Plaintiff was not provided with a termination letter at the time of his discharge.

72. Following his termination on August 16, 2024, Plaintiff contacted Defendant's Human Resources department.

73. Approximately one week after Plaintiff's termination, Plaintiff spoke with Ashley in Defendant's Human Resources department, and Ashley told Plaintiff that Defendant was investigating the circumstances of his termination.

74. Despite Ashley's representation that an investigation was ongoing, Defendant sent Plaintiff a termination letter dated August 28, 2024, twelve days after his discharge, confirming his termination without any indication that a fair investigation had been conducted.

75. The termination letter stated Plaintiff was terminated for alleged violations of the Associate Behavior and Work Rules Policy by "using company time, tools and/or materials to perform work on personal vehicles."

76. Defendant's stated reason for Plaintiff's termination was pretextual.

77. Plaintiff had completed all assigned work tasks before taking his lunch break and repairing his vehicle on his own time.

78. Defendant accused Plaintiff of taking two lunch breaks on July 11, 2024, but this accusation was false. At noon, Plaintiff was transporting a truck between shop locations.

79. Upon information and belief, the two coworkers who helped Plaintiff repair his vehicle, Frank and Osman Kamara, received no discipline or reprimand whatsoever.

80. Approximately one year before his termination, Plaintiff received a written warning for breaking a lift, which was investigated. However, other coworkers who broke lifts, engaged in welding without permission, used torches without training, and put the wrong parts and tires on trucks were not investigated or disciplined.

81. Shortly after Plaintiff's termination, Defendant hired two Tech 3 level employees to replace Plaintiff, one of whom is related to management and is not of the same ethnic background as the Plaintiff.

82. The temporal proximity between Plaintiff's repeated complaints of discrimination and his termination on his two-year anniversary date establishes a causal connection between the protected activity and the adverse employment action.

83. Defendant's proffered reason for termination is not credible and is a pretext for unlawful discrimination and retaliation.

84. Defendant terminated Plaintiff because of his national origin and in retaliation for his complaints about discrimination and harassment based on his national origin.

**COUNT I - DISCRIMINATION IN VIOLATION OF TITLE VII**

85. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

86. Title VII prohibits employers from discriminating against employees on the basis of national origin and religion. 42 U.S.C. § 2000e-2(a).

87. Plaintiff is a member of a protected class based on his Arabic descent, Egyptian national origin.

88. Defendant subjected Plaintiff to a hostile work environment, disparate treatment, and ultimately termination because of his national origin and religion.

89. Plaintiff was subjected to severe and pervasive harassment based on his national origin and religious beliefs, including ridicule of his accent, exclusion from workplace communications, racist epithets, dangerous physical harassment, and being called a "slave."

90. The harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

91. Defendant knew or should have known of the harassment and failed to take prompt and effective remedial action.

92. Plaintiff suffered adverse employment actions, including termination, because of his national origin and religion.

93. Defendant's actions were intentional, willful, and in reckless disregard of Plaintiff's federally protected rights.

94. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, and injury to his professional reputation.

## COUNT II - RETALIATION IN VIOLATION OF TITLE VII

95. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

96. Title VII prohibits employers from retaliating against employees who oppose unlawful discriminatory practices.

97. Title VII prohibits employers from retaliating against employees who oppose discriminatory practices or who participate in proceedings under Title VII. 42 U.S.C. § 2000e-3(a).

98. Plaintiff engaged in protected activity by complaining to management on multiple occasions about harassment and discrimination based on his national origin.

99. Defendant was aware of Plaintiff's protected activity.

100. Defendant terminated Plaintiff's employment on August 16, 2024.

101. Plaintiff's termination constituted an adverse employment action.

102. There is a causal connection between Plaintiff's protected activity and his termination, as evidenced by the temporal proximity of his complaints to his termination, Defendant's failure to discipline employees who harassed him, the pretextual nature of the

stated reason for termination, and Defendant's differential treatment of similarly situated employees who were not terminated for similar or worse conduct.

103. Defendant's proffered reason for Plaintiff's termination was pretextual and not the true reason for his discharge.

104. But for Plaintiff's complaints of discrimination, Plaintiff would not have been terminated.

105. Defendant's actions were intentional, willful, and in reckless disregard of Plaintiff's federally protected rights.

106. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, and injury to his professional reputation.

## COUNT III - DISCRIMINATION IN VIOLATION OF PHRA

107. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

108. The PHRA prohibits employers from discriminating against employees on the basis of national origin. 43 P.S. § 955(a).

109. Plaintiff is a member of a protected class based on his Arabic descent and Egyptian national origin.

110. Defendant subjected Plaintiff to a hostile work environment, disparate treatment, and ultimately termination because of his national origin and religion.

111. Plaintiff was subjected to severe and pervasive harassment based on his national origin, including ridicule of his accent, exclusion from workplace communications, racist epithets, dangerous physical harassment, and being called a "slave."

112. The harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

113. Defendant knew or should have known of the harassment and failed to take prompt and effective remedial action.

114. Plaintiff suffered adverse employment actions, including termination, because of his national origin and religion.

115. Defendant's actions were intentional, willful, and in reckless disregard of Plaintiff's rights under the PHRA.

116. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, and injury to his professional reputation.

## COUNT IV - RETALIATION IN VIOLATION OF PHRA

117. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

118. The PHRA prohibits employers from retaliating against employees who oppose discriminatory practices. 43 P.S. § 955(d).

119. Plaintiff engaged in protected activity by complaining to management on multiple occasions about harassment and discrimination based on his national origin.

120. Defendant was aware of Plaintiff's protected activity.

121. Defendant terminated Plaintiff's employment on August 16, 2024.

122. Plaintiff's termination constituted an adverse employment action.

123. There is a causal connection between Plaintiff's protected activity and his termination, as evidenced by the temporal proximity of his complaints to his termination, Defendant's failure to discipline employees who harassed him, the pretextual nature of the stated reason for termination, and Defendant's differential treatment of similarly situated employees who were not terminated for similar or worse conduct.

124. Defendant's proffered reason for Plaintiff's termination was pretextual and not the true reason for his discharge.

125. But for Plaintiff's discrimination complaints, Plaintiff would not have been terminated.

126. Defendant's actions were intentional, willful, and in reckless disregard of Plaintiff's rights under the PHRA.

127. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, and injury to his professional reputation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that Defendant's conduct violated Title VII and the PHRA;

B. Award Plaintiff economic damages for lost wages and benefits;

C. Award Plaintiff compensatory damages for emotional distress;

D. Award Plaintiff punitive damages;

E. Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and 43 Pa.C.S.A. § 962(f);

F. Grant such other and further relief as this Court deems just and proper.

### REQUEST FOR JURY TRIAL

Plaintiff requests a jury trial for all applicable claims raised in this action.

Respectfully submitted,

**HARDWICK BENFER, LLC**

*/s/ JCBenfer*
_____

Tiffanie C. Benfer (PA #202096)
**HARDWICK BENFER, LLC**
2003 S. Easton Road
Suite 308
Doylestown, PA 18901
Telephone: (215) 230-1912
Facsimile: (215) 230-1913
Email: tbenfer@hardwickbenfer.com
*Attorney for Plaintiff*

Dated: January 30, 2026